## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

JEOVANY T. ORTIZ,

      Petitioner,

v.                               Case No.  1:17-cv-133-MW/MJF

MARK S. INCH,[1]

      Respondent.

_____/

## ORDER and
## REPORT AND RECOMMENDATION

Jeovany T. Ortiz has filed an amended petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 5). Respondent ("the State") answered, providing relevant portions of the state court record. (Doc. 29). Ortiz replied. (Doc. 43). The undersigned concludes that no evidentiary hearing is required for the disposition of this matter and Ortiz is not entitled to habeas relief.[2]

_____

[1] In January 2019, Mark S. Inch succeeded Julie Jones as Secretary of the Florida Department of Corrections and is automatically substituted as the Respondent. *See* Fed. R. Civ. P. 25(d).

[2] This case was referred to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C); Fed. R. Civ. P. 72(b).

## I.    Background Facts and Procedural History[3]

On January 6, 2012, Petitioner Ortiz (a/k/a/ "Gee") and his co-defendants, Janiel Perez, Armando Perez, and Christopher Pate, gathered at Pate's residence. The four were acquainted through Pate's girlfriend, Kameo Carter. Ortiz asked Pate if he knew anyone they could rob. Pate suggested William Robinson (a/k/a/ "Sweet"), whom Pate knew was a drug dealer. Pate considered Robinson a worthy prospect because he sold drugs and likely would not call the police. After Pate identified Robinson as a promising target, the four men planned the robbery: Pate would contact Robinson under the guise of arranging a drug buy (which Pate and Carter had done before); Pate would "lure him outside . . .", and then the group of four (Pate, Ortiz, and the two Perezes) would rob him.

In accordance with the plan, Pate contacted Robinson and set up the "transaction." Ortiz and the Perezes went back to their residence to "get dressed." They returned to Pate's residence 10 minutes later wearing dark and black clothing. They agreed that it would be best to lure Robinson outside his home because "it would be more easier without letting everybody else notice that was in the house."

_____

[3] The facts are drawn from the evidence presented at trial, viewed in the light most favorable to the State. (Doc. 29, Ex. C (trial transcript)); *see also Jackson v. Virginia*, 443 U.S. 307 (1979).

Pate armed himself with a BB gun, and the group (Pate, Ortiz and the two Perezes) got into Janiel Perez's car. Pate's girlfriend, Kameo Carter, joined them for the ride, apparently ignorant of the planned heist.

Janiel Perez drove while Ortiz rode in the front passenger seat. Pate observed from the back seat that Ortiz had a .380 caliber pistol. The group made a couple of stops, including at a convenience store. When Pate received a text from Robinson inquiring if the deal was still on, Janiel Perez drove the group to Robinson's home and parked about 200 yards away. By now it was 3:00 a.m. on January 7, 2012.

The four men exited Perez's vehicle. Pate carried his BB gun tucked inside his waistband. Ortiz put on a mask and armed himself with his .380 caliber pistol. Janiel Perez put on a mask and carried a baseball bat. Armando Perez wrapped a shirt around his face and brought a BB gun. The four then walked to Robinson's home.[4]

Pate texted Robinson to come outside, but Robinson told Pate to come inside. Robinson's refusal to come outside put a kink in the foursome's original plan. Pate walked to the door of Robinson's house. Ortiz, Janiel Perez, and Armando Perez

---

[4] The house belonged to Robinson's mother, who lived there along with her fiancé and Robinson.

stationed themselves at the side of the house. Robinson opened the door for Pate, and Pate entered. Minutes later, as Pate and Robinson were talking in the kitchen, Ortiz and Janiel burst into the residence wearing their masks. Ortiz pointed his pistol at Robinson and demanded money, but Robinson denied having any. Ortiz then placed the barrel of his gun against Robinson's head and repeated his demand. Robinson grabbed the end of Ortiz's gun, slammed Ortiz onto the couch and punched Ortiz while simultaneously yelling for help. Robinson was hoping to "wake everybody up in the house." Janiel Perez joined the struggle and hit Robinson in the head with the bat. Ortiz then "pistol whipped" Robinson about the face and head with the butt of his pistol. Ortiz's beating "split [Robinson's] head open". Robinson estimated that he was hit 30-40 times.

Robinson's mother and her fiancé emerged from the back of the house. Ortiz fled, followed by Perez and Pate. Robinson pursued them until Ortiz turned around and fired a shot which narrowly missed Robinson. Ortiz, Pate, and the two Perezes continued to flee until they reached Perez's car. The group drove back to Pate's residence. At the residence, Kameo Carter observed Ortiz with his gun.

Robinson was taken to the hospital and treated for head injuries. Robinson reported to law enforcement that Pate was one of the perpetrators. Robinson was certain of this because he knew Pate and Pate's face was uncovered during the

attempted robbery. Pate, in turn, implicated Armando Perez by name, and Ortiz and Janiel Perez by their respective nicknames, "Gee" and "Pauley".

Within hours, law enforcement officers interviewed Armando Perez. Armando Perez denied involvement in the crimes, but revealed his residential address. Officers drove to that address in an unmarked vehicle and, when they pulled into the driveway, Ortiz and Janiel Perez fled from the back of the house. Law enforcement officers identified themselves. Janiel Perez stopped in the yard, but Ortiz jumped the fence and ran down the block. The police chased Ortiz until he ran into thick underbrush. Ortiz later surrendered after officers surrounded the area. (Doc. 29, Ex. C).[5]

Ortiz was charged in Levy County Circuit Court Case No. 2012-CF-18, with four crimes: burglary with battery; conspiracy to commit home invasion robbery; aggravated battery with a deadly weapon; and resisting an officer without violence. (Ex. A, pp. 34-35). Ortiz was tried along with Janiel Perez. Christopher Pate and

---

[5] All references to exhibits are to those provided at Doc. 29. Where a page of an exhibit bears more than one page number, the court cites the number appearing at the bottom center of the page.

Kameo Carter testified for the State. Pate identified Ortiz as the masked gunman.[6] Pate identified Janiel Perez as the masked intruder who carried the baseball bat. The jury found Ortiz guilty of all four crimes. (Ex. A, pp. 69-70 (verdict)).

The trial court adjudicated Ortiz guilty and sentenced him to a total term of 30 years in prison. (Ex. A, pp. 54-61 (judgment and sentence); Ex. C, pp. 434-35 (transcript of sentencing).[7] The Florida First District Court of Appeal ("First DCA") affirmed on March 28, 2014, *per curiam* and without written opinion. *Ortiz v. State*, 134 So. 3d 955 (Fla. 1st DCA 2014) (Table) (copy at Ex. F).

On November 17, 2014, Ortiz filed a *pro se* motion for postconviction relief under Florida Rule of Criminal Procedure 3.850, raising nine claims. (Ex. H, pp. 1-27). The state circuit court summarily denied relief on Grounds 2-4 and 6-9, and ordered an evidentiary hearing on Grounds 1 and 5. The court appointed postconviction counsel to assist Ortiz. (Ex. H, pp. 31-208).

---

[6] Pate was certain that Ortiz was the masked gunman, not only because Ortiz was holding the gun earlier, but also because Pate recognized Ortiz's clothing and his voice when he demanded money from Robinson.

[7] Ortiz was sentenced to concurrent terms of 30 years of imprisonment for the burglary, 15 years in prison for the conspiracy to commit home invasion robbery, 15 years in prison for the aggravated battery, and 60 days in jail for resisting the officer.

After the evidentiary hearing, the circuit court entered a final order denying postconviction relief. (Ex. K, pp. 1-137 (evidentiary hearing transcript); Ex. I, pp. 222-418 (final order denying postconviction relief)). The First DCA affirmed *per curiam* without written opinion. *Ortiz v. State*, 222 So. 3d 1210 (Fla. 1st DCA 2016) (Table) (copy at Ex. N). The mandate issued February 28, 2017. (Ex. O).

Ortiz filed his *pro se* federal habeas petition on May 17, 2017, (Doc. 1), which he later amended (Doc. 5). Ortiz's amended petition raises nine claims of ineffective assistance of trial counsel. (Doc. 1, pp. 4-26). The State asserts that Ortiz's claims are devoid of merit. (Doc. 29, pp. 16-86).

## II.     Governing Legal Principles

### A.     Section 2254 Standard of Review

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). The United

States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[8] Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412-13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court" at the time the state court rendered its decision. *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). After identifying the governing legal principle, the federal court must determine whether the state court's adjudication is contrary to the clearly established Supreme Court case law. The

---

[8] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367-75, 390-99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403-13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (holding that § 2254(d)(1) "does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court. *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court when that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See Gill v. Mecusker*,

633 F.3d 1272, 1292 (11th Cir. 2011). As with the "unreasonable application"

clause, federal courts apply an objective test. *See Miller-El v. Cockrell*, 537 U.S.

322, 340 (2003) (holding that a state court decision based on a factual determination

"will not be overturned on factual grounds unless objectively unreasonable in light

of the evidence presented in the state court proceeding"). Federal courts "may not

characterize . . . state-court factual determinations as unreasonable merely because

we would have reached a different conclusion in the first instance." *Brumfield v.*

*Cain*, 576 U.S. —, —, 135 S. Ct. 2269, 2277 (2015) (quotation marks omitted).

The Supreme Court has often emphasized that a state prisoner's burden under

§ 2254(d) is "difficult to meet, . . . because it was meant to be." *Richter*, 562 U.S.

at 102. The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L.Ed.2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244). It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents. It goes no
> further. Section 2254(d) reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal justice systems," not
> a substitute for ordinary error correction through appeal. *Jackson v.*
> *Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (Stevens, J., concurring in judgment). As a condition for
> obtaining habeas corpus from a federal court, a state prisoner must
> show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well

> understood and comprehended in existing law beyond any possibility
> for fairminded disagreement.

*Richter*, 562 U.S. at 102-03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

## B.    Federal Law Regarding Claims of Ineffective Assistance of Counsel

The Supreme Court follows a two-pronged test when evaluating claims of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668 (1984). The petitioner must show (1) his counsel's performance was constitutionally deficient, and (2) the deficient performance prejudiced him. *See id.* at 687. "First, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (quoting *Strickland*, 466 U.S. at 694).

"Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Trial counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. The burden to overcome that presumption and show that counsel's performance was deficient "rests squarely on the defendant." *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("To overcome that presumption, a defendant must show that counsel failed to act reasonably considering all the circumstances." (quotation marks and alterations omitted)).

*Strickland*'s prejudice prong requires a defendant to establish a "reasonable probability" of a different result. *See Strickland*, 466 U.S. at 694. A reasonable probability is one that sufficiently undermines confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

When a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are

mixed questions of law and fact. *See Strickland*, 466 U.S. at 698. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Richter*, 562 U.S. at 105 (citations omitted). As the Supreme Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Id.* (citations omitted).

## III.    Discussion

### <u>Ground One</u>      <u>"Ineffective Assistance For Failing To: Properly Advise Ortiz Of State's Plea Offer"</u>

Ortiz claims that "at the onset of the case, the State had a plea offer of 10 years on the table," (Doc. 5, pp. 4-5), but the offer lapsed because defense counsel "did not explain any time table" for accepting it. (*Id.*, p. 18). The State made a second offer on January 10, 2013, for Ortiz to plead guilty to one charge—conspiracy to commit home invasion robbery—in exchange for a 12-year sentence and dismissal

of the remaining charges. (*Id*.). Ortiz alleges that he rejected the second offer because defense counsel told him that Armando Perez was not testifying for the State; the only evidence against him was Christopher Pate's and Kameo Carter's testimony; and DNA testing on a ski mask and pistol grip recovered from the crime scene "apparently yielded no results." (Doc. 5, p. 18). The State made a third plea offer during jury selection on February 25, 2013, except this time increased the sentence to 20 years. (*Id*.). Ortiz rejected that offer for the same reasons as before, and because he believed the State's case "revolved around non-credible witnesses only." (*Id*.).

Ortiz recounts that at trial, the State presented the testimony of Dr. Pollock, who developed Ortiz as a possible contributor to a mixed DNA profile recovered from the ski mask. (Doc. 29, Ex. C, pp. 245-47). DNA testing of a pistol grip found at the scene yielded no results, and DNA testing of blood spatter on a pair of tan shoes excluded Ortiz as a contributor. (*Id*., pp. 248, 251).

Ortiz contends that he was denied the right to effective assistance of counsel when he was considering the three plea offers because counsel was unaware that Dr. Pollock had found Ortiz to be a possible source of DNA found on the ski mask. Ortiz explains:

> [H]ad counsel properly investigated and remained on top of pertinent case development, he [Ortiz] would have been able to make an informed choice of whether or not to reject the plea offers of the State.

Page 14 of 65

> Had counsel properly informed Ortiz that the State had DNA evidence or at least DNA evidence that did not "exclude" him, Ortiz would have accepted the original 10-year or 12-year plea offers rather than proceed to trial.

(Doc. 5, p. 19).

The parties agree that Ortiz presented this claim to the state courts as Ground One of his Rule 3.850 motion; that the state circuit court denied relief on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 5, p. 5; Doc. 29, pp. 8, 16). The State asserts that Ortiz is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 16-37).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary); *id.* at 100 ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'").

Page 15 of 65

Where, as here, there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment, federal courts employ the following "look through" presumption: "[T]he federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. —, 138 S. Ct. 1188, 1192 (2018). This court, therefore, must presume that the First DCA rejected Ortiz's claim for the reasons provided by the state circuit court.

The state circuit court held an evidentiary hearing on this claim and, at the close of the hearing, stated: "I would like to conduct a further review of my notes, but I can tell you from the outset that I'm going to deny the motion. There is little doubt in my mind, if any doubt, that this new evidence would have caused Mr. Ortiz to have pled earlier based on the evidence I've learned here today. . . . So the motion is denied, and I will prepare the order." (Ex. K, p. 134).

On January 11, 2016, the circuit court entered a final order denying postconviction relief. (Ex. I, pp. 222-418). The order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25), and rejected Ground One for these reasons:

5.     As to Ground One, Defendant alleges that trial counsel was ineffective for failing to properly advise Defendant regarding the State's plea offer and the evidence that would be utilized by the State. According to Defendant, he would not have rejected the State's plea offers "[h]ad counsel properly informed [him] that the state had DNA evidence or at least DNA evidence that did not 'exclude' him, [he] would have accepted the original 10-year or 12-year plea offers rather than proceed to trial."

During jury selection, the State told the prospective jurors:

[O]ne thing you won't see in this case or that nothing will affect in this case is DNA evidence. **This case will not involve the presence of DNA evidence**, whether it's blood, semen, saliva, urine, whatever they find DNA – hair nowadays, whatever it may be. **This case does not involve DNA type evidence. You'll hear other types of evidence but not that**.

*See* Jury Selection Transcript at 97 (lines 21-23) (emphasis added)

During trial, the State introduced expert testimony that Defendant could not be excluded as a possible contributor of DNA that was found on a ski mask in the victim's home. *See* Trial Transcript at 245 (lines 3-25) – 247 (lines 1-15). The ski mask was torn off one of the perpetrators by the victim. Upon this testimony being given, both Defendant's counsel and his co-defendant's counsel notified the judge that they had never seen the report that this testimony was based on. *Id.* at 241 (lines 12-25) – 244 (lines 1-14). Because the State could prove that they sent the report to the defense, the judge declined to hold a *Richardson* hearing. *Id.* at 243 (lines 3-7), 244 (lines 9-10), In its closing argument, the State relied upon the DNA evidence to argue Defendant's guilt. *Id.* at 372 (lines 10-25) – 373 (lines 1-10).

6.     During the evidentiary hearing, former defense counsel Delinda Jan Smith testified that she has a bachelor of science degree from Florida Gulf Coast University with a major in Criminology and a minor in Forensic Science. She graduated from the University of

Florida Levin College of Law in 2007; and, became a licensed attorney in Florida in 2008. From Spring 2007 through summer 2007, Ms. Smith was a certified legal intern at the Eighth Judicial Circuit Public Defender's Office. She subsequently stayed on as a paid employee of the Public Defender's Office, ultimately becoming an assistant public defender. Ms. Smith was an assistant public defender until March /April 2011, at which time she left to join the firm of Silverman Vorhis & Mack, where she currently is an associate. Prior to representing Defendant, Ms. Smith had been the defense attorney in several hundred criminal cases; and, tried approximately 24 criminal cases as a criminal defense attorney.FN2

> FN2  Of the approximately 24 trials, about half were felony trials; and, 4-5 of the felony trials involved DNA evidence, with at least one being primarily based on DNA evidence.

According to Ms. Smith, the first pre-deposition plea offer in this case was for a sentence of 10 years. The offer was made in approximately May 2012. Ms. Smith advised Defendant of the plea offer, as well as the fact that the plea offer would be withdrawn by the State if they (the defense) set depositions. Because she already had discovery at this point in the case, Ms. Smith knew that this was "an incredibly fair" plea offer; and, she "emphatically" advised Defendant that he should accept the offer because he was facing a possible life sentence if convicted as charged. However, according to Ms. Smith, Defendant rejected the offer, as well as any subsequent offers of 12 years and 20 years because, as he indicated to her, he had "faith [that] everything would turn out fine" if he went to trial. It was clear to Ms. Smith that Defendant was not interested in negotiating a plea with the State; and, that he would not enter a plea unless his co-defendant Janiel Perez also entered a plea.FN3 In discussing the case with Defendant, Ms. Smith consistently made him aware of the evidence against him as it [sic], including the deposition testimony of two of his co-defendants (Christopher Pate and Kameo Carter), both of whom implicated him in the charged offenses. These two co-defendants had become State witnesses, and both would be testifying against him at trial. Knowing this fact, defendant still wished to continue to trial.

FN3  According to Ms. Smith, Defendant and Janiel Perez had decided to either plea together or "go down" together.

Ms. Smith further testified at the hearing that she did not depose the Florida Department of Law Enforcement (FDLE) witness (James Pollock) at issue in this case prior to trial for two reason[s]. First, the State did not disclose his report until December 2012, two months prior to trial.FN4 *See* State's Supplemental Discovery Exhibit (filed December 4, 2012). And, Defendant wanted to go to trial as quickly as possible. Second, it is her standard practice not to depose every FDLE witness, but instead to rely upon what is contained in their reports when appropriate.

FN4  Ms. Smith additionally indicated that she had deposed Dr. Pollock in other cases and was familiar with how he would testify at trial.

As for the prosecutor's comment at jury selection, Ms. Smith noted that the prosecutor who conducted jury selection was not the prosecutor who prepared the case. The prosecutor who prepared the case for the State was on vacation that day; however, he returned to try the case. The prosecutor who conducted jury selection had no substantive involvement in the case, other than conducting jury selection. Thus, he was unaware of the evidence that would be presented by the State during trial. When he made the statement quoted previously under this ground, Ms. Smith thought it was "odd," but she did not believe at the time that it was worth correcting.

According to Ms. Smith, she knew that the State would be calling FDLE analyst James Pollock as a witness at trial; however, she did not anticipate that he would testify that Defendant was not excluded as a possible contributor of DNA found on the ski mask. When Dr. Pollock did testify on this issue, both she and co-defendant Perez's counsel asked to approach to discuss the matter with the court. They subsequently asked the court for a break to review the report and to speak with Dr. Pollock about the contents of the report. Based on her

review of the report, her conversation with Dr. Pollock, and her knowledge of DNA science, Ms. Smith knew that Dr. Pollock could not identify anyone in this case as being the contributor of the DNA found on the ski mask. Furthermore, she knew that the number of possible contributors was exceptionally large.FN5 As Dr. Pollock put it at trial, "4 percent of the population would be included [as possible contributors], but 96 percent of the population would be excluded as possible contributors." *See* Trial Transcript at 247 (lines 13-15), 253 (lines 8-25) - 254 (lines 1-4). In other words, 4 out of every 100 people in the general population would have the same DNA profile as that found on the ski mask. In addition, Dr. Pollock could not testify as to when the DNA came to be on the ski mask. When Ms. Smith advised Defendant during trial that he could not be excluded as a possible contributor of the DNA found on the ski mask, he did not seem alarmed by this new information. As Ms. Smith indicated during the hearing, this evidence was no more damning that the other circumstantial evidence (tire tracks, shoe prints, his flight from law enforcement to avoid arrest, etc.) introduced at trial; not to mention the direct evidence of Defendant's involvement as testified to by his co-defendants. And, during closing argument, she emphasized to the jury how weak this DNA evidence was, noting that if 150 people were in the jury pool on that Monday, statistically speaking 6 of those people would have had the same DNA profile as the one found on the ski mask. *See* Trial Transcript at 331 (lines 11-25) - 332 (lines 1-16).

> FN5   Besides her forensic science background, Ms. Smith had also previously tried cases where her client could not be excluded as a possible DNA contributor.

Regardless of the fact that she saw the DNA evidence as weak, Ms. Smith was confident during the hearing that Defendant, had he known of the DNA evidence prior to trial, would still have rejected the State's plea offer and proceeded to trial.

7.     Defendant testified at the hearing that his DNA sample had been taken prior to his first meeting with Ms. Smith. And, at their first meeting, Ms. Smith indicated to him that the State did not have any

DNA results from FDLE yet. According to Defendant, Ms. Smith told him that all the State had against him was the testimony of his co-defendants.

According to Defendant, he did not know of Dr. Pollock's report, and his proposed testimony regarding the DNA evidence, until trial. And, had he known of them, he would have accepted the State's February 2013 plea offer of 12 years, and not proceeded to trial.

8.    In order for a defendant "to establish prejudice [caused by a lost plea offer], the defendant must allege and prove a reasonable probability, defined as a probability sufficient to undermine confidence in the outcome, that (1) he or she would have accepted the offer had counsel advised the defendant correctly, (2) the prosecutor would not have withdrawn the offer, (3) the court would have accepted the offer, and (4) the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Alcorn v. State*, 121 So. 3d 419, 422 (Fla. 2013).

Here, given Defendant's pre-trial lack of interest in negotiating a plea; his lack of interest in entering a plea if his co-defendant Janiel Perez did not enter a plea; and, his confidence that the jury would not believe the trial testimony of his co-defendants Christopher Pate and Kameo Carter, Defendant fails to show a reasonable probability that he would have entered a plea even if he had known of Dr. Pollock's report and proposed testimony prior to trial. Even when the State offered Defendant a plea of 20 years (a 10-year reduction in his current sentence) if he withdrew his rule 3.850 motion prior to the evidentiary hearing on December 10, 2015, he still rejected the State's offer (however, he did express a willingness to accept a 10-year sentence, which the State would not agree to). As Ms. Smith  noted during the evidentiary hearing, there was substantial circumstantial evidence, and direct evidence in the form of his co-defendant's testimony, tying Defendant to the charged offenses. The DNA evidence at issue here was merely additional circumstantial evidence. It neither proves nor disproves Defendant's involvement in the offense. In addition, it is undisputed that Defendant was not shocked when he learned of its

existence for the first time during his trial. And, like Ms. Smith, Defendant did not see its existence as undermining their defense. Thus, even if counsel did err by failing to advise Defendant of the inclusive DNA evidence prior to trial, there is not a reasonable probability that Defendant would have pled based on this one additional piece of evidence. Accordingly, the claim raised is without merit.

(Ex. I, pp. 225-231) (alterations in original).

This court defers to the state court's factual findings, because they are amply supported by the record and because Ortiz has not rebutted them with clear and convincing evidence to the contrary. This deference extends to the state court's determination that Attorney Smith's testimony was credible. Eleventh Circuit precedent requires this deference. "Determining the credibility of witnesses is the province and function of the state courts, not a federal court engaging in habeas review. Federal habeas courts have 'no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 845 (11th Cir. 2011) (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). The "AEDPA affords a presumption of correctness to a factual determination made by a state court; the habeas petitioner has the burden of overcoming the presumption of correctness by clear and convincing evidence." *Consalvo*, 664 F.3d at 845 (citing 28 U.S.C. § 2254(e)).

Given the state court's findings of fact, fairminded jurists can concur in the court's conclusion that Ortiz failed to establish prejudice under *Strickland*. A defendant's Sixth Amendment right to counsel "extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012) (citing *Missouri v. Frye*, 566 U.S. 133, 138 (2012), and *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). "If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler*, 566 U.S. at 168. The two-part test articulated in *Strickland* applies to claims that counsel was ineffective during plea negotiations. *Lafler*, 566 U.S. at 163 (applying *Strickland*'s two-part test to federal habeas petitioner's claim that counsel was ineffective for advising him to reject a plea offer). In the context of a rejected plea offer, *Lafler* instructs that a petitioner must show that "but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 163-64.

The record confirms that Dr. Pollock's October 24, 2012, report on DNA testing of the ski mask was disclosed to the defense on December 4, 2012. (*See* Doc. 29, Ex. H, pp. 211-14 (copy of State's Supplemental Discovery Exhibit); Ex. K, p. 58 (Rule 3.850 evidentiary hearing transcript discussing the report and the timing of its disclosure)). Because that report did not exist at the time of the 10-year plea offer, it could not have affected Ortiz's decision whether to accept that offer. Additionally, as Attorney Smith testified, she communicated the 10-year offer to Ortiz and "encourage[d] him emphatically" to accept it. (Ex. K, p. 81). Ortiz responded with a "flat no", (Ex. K, p. 28), and "was pretty firm very early on that it was going to be a trial case." (Ex. K, pp. 25-27).

The 12- and 20-year offers came after disclosure of Dr. Pollock's report, but as the state court reasonably determined, Ortiz failed to show a reasonable probability he would have accepted either offer had he known the results of Dr. Pollock's report. As the state court found, when Attorney Smith discussed the report with Ortiz at trial, he did not view the evidence as a game changer.  He did not seem concerned by it and did not indicate that he wanted to stop the trial and plead guilty. (Ex. K, p. 65). Ortiz's reaction (or lack thereof) to the report is consistent with Attorney Smith's testimony that Ortiz's decision to reject the plea offers was driven

by three factors: (1) Ortiz's certainty that the jury would not believe Pate due to his

prior inconsistent statements and motivation to lie; (2) Ortiz's resolve that he would

not accept a plea offer unless Janiel Perez accepted one; and (3) Ortiz's faith that

"everything was going to turn out fine." (Ex. K, pp. 27, 37-38, 43-44). Smith was

asked directly at the postconviction evidentiary hearing:

> Q. [By the State] And is it your belief, based on your representation of
> Mr. Ortiz, that if you had discussed that report with him prior to trial,
> he would have accepted the plea offer?
>
> A. [Defense Counsel Smith] Based on my communication with Mr.
> Ortiz for that full year, I don't know of anything that would have
> convinced him that he should plea.

(Ex. K, pp. 66-67).

Ortiz has not established prejudice under *Strickland*, and certainly has not

established that the state court's decision was an unreasonable application of

*Strickland*. Ortiz is not entitled to habeas relief on Ground One.

### Ground Two        "Ineffective Assistance For Failing To: Object/Limine To Prohibit Non-Relevant Evidence"

Ortiz claims that his trial counsel was ineffective for failing to object, on the

basis of "lack of foundation or relevancy", to the admission of six items of evidence

seized from the home where Armando Perez resided and from which Ortiz and Janiel

Perez fled from law enforcement. (Doc. 5, pp. 6, 19; *see also* Doc. 43, pp. 21-24

(Ortiz's identification of the Florida Evidence Code and state law cases as the legal bases for the proposed objection). Ortiz claims that he was prejudiced by counsel's conduct because: "In a case, with virtually no evidence but an unreliable, perjured witness, Christopher Pate, the above evidence likely tipped the scales in the State's favor and affected the verdict." (Doc. 5, p. 19).

The parties agree that Ortiz presented this claim to the state courts as Ground Two of his Rule 3.850 motion; that the state circuit court denied relief on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 5, p. 6; Doc. 29, pp. 8, 38). The State asserts that Ortiz is not entitled to federal habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 38-40).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson, supra*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

As to Ground Two, Defendant alleges that trial counsel was ineffective for failing to object and/or file a motion in limine to prevent the introduction of evidence not related to the crime. According to Defendant, counsel should have moved to exclude the evidence (a baseball bat, black Nike tennis shoes, white DVS tennis shoes, white Polo tennis shoes, brown Mark Ecko shoes, and a black knit cap) that was found at the residence where Defendant and his co-defendant were apprehended. Defendant contends that these items are irrelevant and have no connection to the crimes charged.

The record reflects that one of the perpetrators was carrying a bat which was consistent with the bat that was recovered during the burglary. *See* Trial Transcript at 60 (lines 22-25) - 61 (lines 1-2), 79 (lines 12-15) - 80 (lines 1-15), 95 (lines 8-25) - 96 (lines 1-9), 98 (lines 20-25) - 100 (lines 1-25), 104 (lines 19-25), 115 (lines 6-7), 167 (lines 12-25) - 168 (line 1, 24-25) - 169 (lines 1-3), 179 (lines 2-3), 267 (lines 5-21), 278 (lines 4-11), 283 (lines 6-16), 285 (lines 4-15), 288 (lines 5-19). Thus, even if the baseball bat which was recovered was not the baseball bat used during the robbery, it is still relevant as evidence that the defendants were in possession of a baseball bat.

The record reflects that the remaining items were relevant as well. *See* Trial Transcript at 23 (line 3-11), 159 (lines 5-12), 182 (lines 1-15), 183 (lines 1-12), 184 (lines 2-8), 206 (lines 19-25) - 207 (lines 1-25) - 208 (lines 1-6).

For these reasons, Defendant fails to show either error by counsel or prejudice due to counsel's failure to move to exclude these items. Accordingly, the claim raised is without merit.

(Ex. I, pp. 260-61). On appeal, Ortiz argued that the circuit court erred because the evidence was inadmissible under state law. (Ex. L, pp. 19-22). Ortiz repeats that argument here. (Doc. 43, pp. 21-24).

Ortiz's claim that the state court unreasonably applied *Strickland* obviously depends upon this court determining that trial counsel's performance was deficient, but first this court would have to conclude that the state court misinterpreted state law. In *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338 (11th Cir. 2005), the Eleventh Circuit addressed a similar circumstance. Petitioner Herring argued that his trial counsel was ineffective for failing to make an objection, based on state law, to the introduction of evidence at the penalty phase of his trial. The state court concluded that Herring's proposed objection would have been overruled and, therefore, counsel was not deficient. *Id*. at 1354-55. The Eleventh Circuit held: "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law had [Herring's counsel] done what Herring argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'" *Id*. (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir.1997)).

More recently, in *Jones v. Sec'y, Dep't of Corr.*, 487 F. App'x 563 (11th Cir. 2012), the Eleventh Circuit addressed the same issue presented here—an ineffective assistance claim based on counsel's failure to object to evidence on the state-law grounds of lack of foundation and relevance. The Eleventh Circuit held:

The state collateral court, in denying Jones' motion for postconviction relief, concluded that the prosecution had laid the proper foundation to introduce the shotgun into evidence, the defense had no basis under state law for objecting to its admission, and the question of whether it was the same gun that was used in the charged robbery was for the jury to decide. The Third District Court of Appeal of Florida affirmed that decision.

When the state courts have already answered the question of how an issue would have been resolved under that state's law had defense counsel done what the petitioner argues he should have done, "federal habeas courts should not second-guess them on such matters" because "it is a fundamental principle that state courts are the final arbiters of state law." *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (quotation marks omitted). Because we will not "second guess" the Florida state courts' conclusion that the shotgun was admissible under state evidentiary law, Jones cannot demonstrate that his counsel was deficient for failing to object to its introduction. *See id.* A lawyer cannot be deficient for failing to raise a meritless claim. *Freeman v. Attorney Gen.*, 536 F.3d 1225, 1233 (11th Cir. 2008).  The state courts' rejection of this claim was neither contrary to nor involved an objectively unreasonable application of *Strickland*.

*Id.* at 566.

Here, as in *Herring* and *Jones*, the state courts have already answered the question of what would have happened had trial counsel made Ortiz's proposed state-law objection—the objection would have been overruled. Because this court will not "second guess" the Florida state court's conclusion that the evidence was admissible under Florida's evidentiary standards, Ortiz cannot demonstrate that his counsel was deficient for failing to object, or that he was prejudiced by this lack of

an objection. *See Herring*, 397 F.3d at 1355; *see also Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("It is not ineffective assistance of counsel to fail to make an objection that is not due to be sustained.") (citing *Green v. Georgia*, 882 F.3d 978, 987 (11th Cir. 2018) (holding that the petitioner could not possibly have suffered *Strickland* prejudice where the objection that was not made would have been futile), and *Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) (stating that "an attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief")).

The state court's rejection of Ortiz's claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Ortiz is not entitled to federal habeas relief on Ground Two.

### <u>Ground Three</u>    <u>"Ineffective Assistance For Failing To: Sever Trials"</u>

Ortiz next claims trial counsel was ineffective for failing to move to sever his trial from co-defendant Janiel Perez's trial, under Florida Rule of Criminal Procedure 3.152(b). Rule 3.152(b) requires a trial court to order severance of defendants and separate trials if the defendant shows that severance "is appropriate to promote a fair determination of the guilt or innocence of 1 or more defendants." Fla. R. Crim. P. 3.152(b)(1)(A). Ortis argues that counsel's failure to move for

severance prejudiced him because the State introduced a videotape from the convenience store showing Christopher Pate, Kameo Carter, and Janiel Perez together in Perez's vehicle shortly before the crime. Ortiz asserts that the video was inadmissible against him, because he was not in the video. Ortiz argues he was prejudiced because the videotape "was the only physical evidence placing Janiel with Pate and Kameo minutes before the robbery, and a reasonable probability exists that Ortiz was found guilty by being a co-defendant or association." (*Id.*, Doc. 5, pp. 7, 19-20).

The parties agree that Ortiz presented this claim to the state courts as Ground Three of his Rule 3.850 motion, the state circuit court denied relief on the merits in a reasoned order, and the First DCA summarily affirmed without explanation. (Doc. 5, pp. 7-8; Doc. 29, pp. 8, 42-43). The State asserts that Ortiz is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 43-45).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. This court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

> As to Ground Three, Defendant alleges that trial counsel was ineffective for failing to move to sever the trials of Defendant and co-defendant Janiel Perez due to evidentiary matters that would transfer guilt to Defendant. According to Defendant, he was prejudiced by being tried with co-defendant Janiel Perez because a surveillance video was shown during the trial which placed Mr. Perez with the other co-defendants around the time of the offense. The video did not place Defendant at the scene.
>
> Besides the surveillance video, there was other evidence presented at trial which implicated Defendant in the charged offenses. First, co-defendant Christopher Pate and his girlfriend Kameo Carter both testified that Defendant was involved in the burglary. *See* Trial Transcript at 46-84, 257-303. Second, DNA evidence which may have been from Defendant was found on a ski mask recovered at the scene of the burglary. *Id*. at 245 (lines 3-25) - 247 (lines 1-15).
>
> The fact that a video was played at trial which placed Mr. Perez with Mr. Pate and Ms. Carter around the time of the offense is neither exculpatory nor inculpatory of Defendant's involvement in the offense. However, even if counsel should have moved for a severance prior to trial, Defendant fails to show prejudice due to the previously stated evidence placing him at the scene of the offense. Accordingly, the claim raised is without merit.

(Ex. I, pp. 261-62).

Even assuming to Ortiz's benefit (as the state court did) that he was not depicted in the video,[9] this court must defer to the state court's state-law determination that the video provided no plausible basis for severance under Rule 3.152(b), because it failed to meet the required standard. *See Herring, supra*. Moreover, given the other evidence placing Ortiz at the scene of the crimes (most notably Pate's and Carter's testimony) which could not have been avoided by severing the trials, Ortiz failed to show he was prejudiced.

The state court's rejection of this claim was consistent with *Strickland* and was based on a reasonable determination of the facts. Ortiz is not entitled to federal habeas relief on Ground Three.

**Ground Four**      **"Ineffective Assistance For Failing To: File A Judgment Of Acquittal Regarding Count Two"**

Ortiz further claims that his trial counsel was ineffective for failing to argue for a judgment of acquittal on the conspiracy count because "the State's evidence failed to establish an intent to conspire to commit home invasion robbery and the

---

[9] Arguably, the question of who was depicted in the videotape was a question of fact for the jury to decide. Kameo Carter testified that she and Janiel Perez got out of the car and entered the convenience store. (Ex. C, p. 55, 56). Christopher Pate testified that Janiel Perez pumped gas, and that Ms. Carter and Ortiz went into the store. (Ex. C, p. 275). The prosecutor argued that the video showed Janiel Perez entering the convenience store with Ms. Carter. (Ex. C, pp. 373-74, 376).

existence of an agreement to commit home invasion robbery." (Doc. 5, pp. 8, 20-21). Ortiz explains:

> The only evidence regarding a plan to commit the robbery came from Pate. The only plan Pate described was a plan to lure Robinson out of his house in order to commit the robbery without other people being present. When Robinson refused to come outside and told Pate to come in the house, the four men did not discuss Robinson's refusal, and Pate did not tell the other three that Robinson was refusing to come outside. The State presented no evidence, circumstantial or otherwise, that Ortiz conspired to commit home invasion robbery.

(Doc. 5, p. 20). Ortiz contends there is a reasonable probability that the trial court would have granted his proposed motion for JOA, or, alternatively if denied, that the First DCA would have reversed the conspiracy conviction. Ortiz acknowledges that his underlying sufficiency of the evidence claim was raised on direct appeal and decided against him, but contends he would have prevailed had trial counsel preserved the issue, because the more lenient standard for preserved errors would have applied instead of the fundamental error standard for unpreserved errors. (Doc. 5, p. 21).

The parties agree that Ortiz presented this claim to the state courts as Ground Four of his Rule 3.850 motion. (Doc. 5, pp. 8-9; Doc. 29, pp. 8, 46). The state circuit court denied relief on this basis:

> As to Ground Four, Defendant alleges that trial counsel was ineffective for failing to file a motion for judgment of acquittal

regarding count II, Conspiracy to Commit Home Invasion Robbery. According to Defendant, there was insufficient evidence presented at trial to support his conviction for Conspiracy.

A defendant cannot challenge the sufficiency of the evidence underlying his convictions through a rule 3.850 motion, especially where there has been a direct appeal. *Betts v. State*, 792 So. 2d 589, 590 (Fla. 1st DCA 2001); *see also Johnson v. State*, 593 So. 2d 206, 208 (Fla. 1992) ("[i]ssues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack). Motions filed under rule 3.850 "cannot be utilized for a second appeal." *Jones v. State*, 446 So. 2d 1059, 1061-62 (Fla. 1984). Accordingly, the claim raised is without merit.

(Ex. I, p. 262).

In his postconviction appeal, Ortiz argued that the circuit court's rejection of his claim was clearly erroneous because his claim was an ineffective assistance of counsel claim cognizable under Rule 3.850, and not a substantive challenge to the sufficiency of the evidence. (Ex. L, p. 24). The State conceded that the ineffective assistance claim was cognizable under Rule 3.850, but argued that the denial of postconviction relief should be affirmed on the alternative ground that Ortiz failed to present a facially sufficient claim under *Strickland*. (Ex. M, pp. 38-39). The State maintained that the record conclusively established sufficient evidence for the jury to reasonably infer Ortiz conspired with his co-defendants to commit a home invasion robbery; therefore, Ortiz could not show trial counsel was ineffective for failing to make his proposed argument. (Ex. M, pp. 38-43). The State also noted,

with regard to Ortiz's claim of prejudice on direct appeal, that the parties' argued on direct appeal that Ortiz's sufficiency of the evidence claim failed even under Florida's more lenient standard for preserved errors. (Ex. M, p. 39).

The First DCA summarily affirmed the denial of postconviction relief without explanation. (Ex. N). This court must determine whether the First DCA's unexplained decision rested on the state procedural bar imposed by the lower court, or on the merits.

Ordinarily, under *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991), this court would presume that the First DCA's unexplained order rested on the same ground as the circuit court's order—a procedural bar. The *Ylst* presumption provides:

> Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground. If an earlier opinion "fairly appear[s] to rest primarily upon federal law," we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place. Similarly where, as here, the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

*Ylst*, 501 U.S. at 803 (citation omitted) (alteration in original). *Ylst* also recognizes, though, that "[s]tate procedural bars are not immortal[;] . . . they may expire because of later actions by state courts." *Ylst*, 501 U.S. at 801. The Court qualified: "we do not suggest that the presumption is irrebuttable; strong evidence can refute it." 501

U.S. at 804. For example, the presumption may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state [appellate] court or obvious in the record it reviewed." *Wilson*, 138 S. Ct. at 1192 (discussing *Ylst*'s "look-through" presumption and the standard for rebutting that presumption).

Here, the parties agreed in Ortiz's postconviction appeal that the lower court improperly imposed a procedural bar and, consequently, they based their briefing exclusively on the merits of Ortiz's ineffective assistance claim. This circumstance is strong evidence that the First DCA's decision most likely rested on the merits as opposed to the procedural bar. The First DCA's summary decision on the merits is entitled to deference under 28 U.S.C. § 2254(d).

The First DCA's rejection of Ortiz's claim was neither contrary to, nor an unreasonable application of, the *Strickland* standard. Counsel was not ineffective for failing to advance Ortiz's argument in support of acquittal, because there was sufficient evidence to prove he conspired with his co-defendants to commit home-invasion robbery.

In Florida, "the crime of conspiracy consists of an express or implied agreement between two or more persons to commit a criminal offense. Both an

agreement and an intention to commit an offense are necessary elements of this crime." *Ramirez v. State*, 371 So. 2d 1063, 1065 (Fla. 3d DCA 1979); *see* Fla. Stat. § 777.04(3) (2008); *Sheriff v. State*, 780 So. 2d 920, 921 (Fla. 4th DCA 2001) ("[T]he state must prove an agreement and an intention to commit an offense."). Direct proof of an agreement is not necessary to establish a conspiracy. The conspiracy can be proved by circumstantial evidence, in other words, based on the surrounding circumstances, a jury may infer that an agreement (or common purpose) to commit a crime existed. *Bradley v. State*, 787 So. 2d 732, 740 (Fla. 2001); *Horner v. State*, 558 So. 2d 138, 139 (Fla. 3d DCA 1990); *see also Glasser v. United States*, 315 U.S. 60, 80 (1942) ("Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a 'development and collocation of circumstances.'"). In compliance with Florida Standard Jury Instruction (Crim.) 5.3 governing criminal conspiracy, the jury at Ortiz's trial was instructed that: "It is not necessary that the Conspiracy to Commit Home Invasion Robbery be expressed in any particular words or that words pass between the conspirators." (Ex. A, pp. 72-74 (jury instructions)).

The evidence adduced at trial, summarized above, was sufficient to support Ortiz's conviction for conspiracy to commit home-invasion robbery. Christopher Pate testified that there was an agreement among himself, Ortiz, and the Perezes to

rob William Robinson. Pate testified that Robinson's unanticipated refusal to come

out of his house forced Ortiz and his co-defendants to modify the original plan of

luring Robinson outside to rob him, to an alternative plan of entering Robinson's

home to rob him. (Ex. C, pp. 257-305). The escalation to the alternative plan

necessitated by Robinson's refusal to exit his home was clearly indicative of an

overall plan on the part of Ortiz and his co-defendants to do whatever was necessary

to achieve their common goal of robbing Robinson, even if that meant entering his

home. Direct proof of an agreement to go inside Robinson's home was unnecessary

to establish the existence of a conspiracy. Rather, the jury could reasonably infer

from all the circumstances accompanying the robbery that Ortiz and his co-

defendants shared the common purpose of committing a home-invasion robbery. *See

Horner*, 558 So. 2d at 139; *Bradley*, 787 So. 2d at 740; Fla. Std. Jury Instr. (Crim.)

5.3.

     The First DCA reasonably rejected Ortiz's claim that counsel was ineffective

for failing to argue there was insufficient evidence of a conspiracy. Ortiz is not

entitled to federal habeas relief on Ground Four.

     **Ground Five**      **"Failing To Object And Move For A Mistrial"**

     Ortiz also claims that his trial counsel was ineffective for failing to object and

move for a mistrial when Kameo Carter mentioned that Ortiz and Janiel Perez were

"behind bars." The comment arose during the State's re-direct of Carter. Carter was asked on cross-examination why she did not allow officers to record her statement to them. (Ex. C, pp. 81-82). Carter responded that she was afraid she might be in trouble because she was with the four men when they committed the crimes. (Ex. C, pp. 81-82). On re-direct, the prosecutor asked:

> Q: Miss Carter, you were asked by defense counsel, [in] reference [to] your interview by law enforcement the next day when they came to your home and they arrested Mr. Pate, and why you did not—or why you told them you did not want to be recorded.
>
> Did you not also tell law enforcement that you didn't want to be recorded because you were scared?
>
> A [Kameo Carter]: No, I didn't tell them that.
>
> Q: Did you tell them that you were worried that if you were recorded, that the people who committed this robbery may hear your statement?
>
> A: No, sir. I was scared.
>
> Q: Were you scared of those individuals?
>
> A: Chris, yeah. I know Armando, but my mom says he's been making threats. I don't know. I don't know.
>
> Q: Were you concerned about Gee or Pauley?
>
> A: I don't know them. I don't—I don't think I should have to—I mean, if I do, then it is what it is. I don't know. Right now they're behind bars; I don't need to be scared.

(Ex. C, pp. 83-84).

The parties agree that Ortiz presented this claim to the state courts as Ground Five of his Rule 3.850 motion; that the state circuit court denied relief on the merits in a reasoned order; and that the First DCA summarily affirmed without explanation. (Doc. 5, pp. 9-10; Doc. 29, pp. 8, 56). The State asserts that Ortiz is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 56-64).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. Consistent with *Wilson, supra*, this court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state postconviction court held an evidentiary hearing on this claim. At the close of the hearing, the court stated: "I would like to conduct a further review of my notes, but I can tell you from the outset that I'm going to deny the motion. . . . I'm not finding that Ms. Smith's decision to not move for a mistrial failed to comply with the prevailing standards of professionalism. It appears to be a tactical decision. It appears to be a sound tactical decision based on the very distinct possibility that you would have a different jury perhaps less favorable to Mr. Ortiz, as well as a

different trial judge. And this was done with the defendant's input, and that's what I'm finding. . . . So the motion is denied, and I will prepare the order." (Ex. K, p. 134).

The court subsequently entered a written final order denying relief on January 11, 2016. (Ex. I, pp. 222-418). The order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25), and rejected Ground Five for these reasons:

> As to Ground Five, Defendant alleges that trial counsel was ineffective for failing to object and move for a mistrial when State's witness Kameo Carter made a comment on redirect regarding Defendant being "behind bars . . . right now." *See* Trial Transcript at 83 (lines 13-25) – 84 (lines 1-7). The record reflects that was an isolated, unsolicited comment by Ms. Carter in response to a question asked by the State on redirect.

> During the evidentiary hearing, Ms. Smith testified that Kameo Carter's statement was not a feature of her testimony and made in passing. Furthermore, Ms. Carter was soft-spoken as a witness. According to Ms. Smith, she did not object to the statement because she did not want to draw emphasis to it, especially before a scheduled recess. Although she and co-counsel did discuss the statement during the recess, they decided that it could do more harm than good if they objected and moved for a mistrial. She and co-counsel were especially concerned that a new trial would mean a less favorable judge, particularly given that the trial judge was a senior judge who regularly imposed lesser sentences than both the incoming and outgoing division judges, as well as a different, potentially less favorable, jury. Ms. Smith also noted that Defendant did not ask her to move for a mistrial when she discussed it with him as well.

Defendant testified during the hearing that had he known at the time of the potential negative consequence of Ms. Carter's statement, he would have insisted that his counsel move for a mistrial.

This Court finds that Ms. Smith's testimony that her decision not to object, not to ask for a curative instruction, and not to move for a mistrial was strategic to be credible and reasonable. It was an isolated remark. And, there is no indication from the record that the jury heard or considered it. Furthermore, Defendant presented no testimony or evidence to suggest that it was not a reasonable trial strategy to not move for a mistrial. This is especially significant given the fact that his co-defendant's counsel did not object or move for a mistrial either. For these reasons, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

(Ex. I, pp. 231-32).

This court defers to the state court's factual findings, including its credibility determination and its determination that counsel's decision not to object was a strategic one made in consultation with co-counsel and Ortiz. Attorney Smith testified that when she heard Carter's comment, she recognized she had a legal basis to object and move for a mistrial, and she strategized with co-counsel and Ortiz about the pros and cons of doing so. Attorney Smith described their tactical considerations: (1) the comment was an isolated, barely audible remark that co-defendant Perez's attorney did not even notice and that the jury may not have discerned; (2) counsel did not want to draw attention to the remark by objecting and requesting a curative instruction; (3) the defense was pleased with the jury panel, and moving for a mistrial

risked the empanelment of a less favorable jury and a less favorable trial and sentencing judge; and (4) a mistrial would have diluted the benefit of Ortiz's demand for a speedy trial. (Ex. K, pp. 69-73).

Based on the record, the First DCA's conclusion—that defense counsel's strategic decision not to object or move for a mistrial was reasonable—was within the bounds of reasonableness under AEDPA. The Supreme Court has recognized that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. . . ." *Strickland*, 466 U.S. at 690; *see also Hubbard v. Haley*, 317 F.3d 1245, 1259 (11th Cir. 2003) ("The Supreme Court has recognized that defense counsel in defending their client's interests, need not urge every conceivable objection the law would provide." (citing *Engle v. Isaac*, 456 U.S. 107, 133-34 (1982))). Ortiz, therefore, is not entitled to habeas relief on Ground Five.

### Ground Six    "I.A.C. For Failing To: Discuss/Develop a Coherent Defense"

In Ground Six, Ortiz claims that counsel was ineffective for advising him not to testify and for failing to discuss an "independent act theory" of defense. (Doc. 5, pp. 10, 22-23). Ortiz alleges that counsel based her advice not to testify on "the fact that the State had no DNA evidence, had only two witnesses who were not reliable,

and no physical evidence placing Ortiz at the scene." (Doc. 5, p. 22). Ortiz argues that this advice was "fallacious" because DNA evidence was introduced at trial, counsel did not impeach Pate or Carter, and counsel failed to object to the physical evidence (discussed in Ground Two above). According to Ortiz, his counsel's poor representation during the State's presentation of its case made it necessary for him to testify, "yet counsel insisted Ortiz remain silent". (Doc. 5, p. 22).

Ortiz alleges that he was prepared to testify that: (1) he only met Christopher Pate through his cousin Armando Perez; (2) he lived with Janiel and Armando and had just moved, which is why there were clothes in Janiel's car, thus rebutting the State's suggestion that it appeared someone was ready to flee; (3) on the night in question, neither Pate nor Armando Perez spoke of a plan to commit a home invasion robbery; (4) on the night in question, Pate and Armando Perez asked Janiel and Ortiz to go for a ride; (5) Pate said they were going to a friend's house to score some dope; (6) upon arriving at a remote location on a dirt road, Pate, Armando, Janiel and Ortiz got out of the car; (7) Pate and Armando told Janiel and Ortiz to wait at the car; (8) a few minutes passed and Ortiz heard a gunshot, then 15-20 seconds later Ortiz heard two more louder shots; (9) Armando and Pate came running to the car and told Ortiz and Janiel to get in and go; (10) Pate admitted they tried to get some dope but had "gotten into it" with the guy; (11) Janiel and Ortiz suspected and feared someone

may have been hurt but they kept quiet because they did not want to be involved; (12) when law enforcement arrived at their residence it was in an unmarked vehicle and Ortiz thought it might be the other party involved in the drug deal gone bad, who was there for payback; (13) for this reason Ortiz and Janiel both fled; and (14) when they realized it was law enforcement, they surrendered. (Doc. 5, p. 22). According to Ortiz, his testimony would have rebutted the State's evidence and provided a reasonable hypothesis of innocence.

The parties agree that Ortiz presented this claim to the state courts as Ground Six of his Rule 3.850 motion, the state circuit court denied relief on the merits in a reasoned order, and the First DCA summarily affirmed without explanation. (Doc. 5, pp. 10-11; Doc. 29, pp. 8, 67). The State asserts that Ortiz is not entitled to relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 67-71).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. This court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

As to Ground Six, Defendant alleges that trial counsel was ineffective for failing to discuss the case and develop a coherent defense based on the evidence, witnesses, and the State's theory. Defendant raises two issues under this ground: (1) he would have testified at trial but for his counsel's advice not to do so; and, (2) counsel failed to discuss with him the possibility of raising an "independent act" defense.

As to the allegation regarding Defendant's proposed testimony, "[t]he first step in determining whether there was ineffective assistance of counsel where defendant claims he would have testified is to determine whether the defendant voluntarily agreed with counsel not to take the stand." *Simon v. State*, 47 So. 3d 883, 885 (Fla. 3d DCA 2010) (citing *Lott v. State*, 931 So. 2d 807, 819 (Fla. 2006)). "If that is established, then the trial court must answer the separate and second question which is whether counsel's advice to defendant 'even if voluntarily followed, was nevertheless deficient because no reasonable attorney would have discouraged [the defendant] from testifying.'" *Id*. Here, as to the first prong, Defendant agreed with his counsel not to take the stand. *See* Trial Transcript at 308 (lines 1-25) - 309 (lines 1-13). As to the second prong, the heart of Defendant's proposed testimony is that there was no plan to commit a home invasion robbery. Instead, co-defendants Christopher Pate and Armando Perez asked Defendant and co-defendant Janiel Perez "to go for a ride" along with Pate's girlfriend, Kameo Carter. The group went to the gas station in the surveillance video, at which Carter and Janiel Perez went inside to pay for the gas and b[u]y food. After Carter received a text message, she handed the phone to Pate, who "said they were going to a friends to score some dope." Then, after they arrived at the victim's home, Pate and Armando Perez went to the victim's home alone, while Defendant, Armando [sic] Perez, and Carter stayed at the car. A few minutes later, Defendant heard a gunshot followed by more gunshots. According to Defendant, Pate and Armando Perez ran back to the car and told him that "they tried to get some dope but got into it with the guy." Had Defendant testified to this version of events, it would have definitively placed him with his co-defendants at the crime scene. Furthermore, the proposed testimony is not credible because there were three perpetrators (Christopher Pate, who was unmasked, and two masked

intruders) inside the victim's home, not two. *See* Trial Transcript at 92 (lines 5-25) - 101 (lines 1-25). No reasonable attorney would have advised Defendant to provide this testimony. For this reason, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

As to the allegation that counsel should have advised Defendant of the "independent act" defense, Defendant contends that he only went with the co-defendants to buy drugs, not rob the victim. According to Defendant, he would have testified to this fact at trial had counsel advised him of the "independent act" defense. "The 'independent act' doctrine arises when one co[-]felon, *who previously participated in a common plan*, does not participate in acts committed by his co[-]felon, 'which fall outside of, and are foreign to, the common design of the original collaboration.'" *Boyd v. State*, 912 So. 2d 26, 27 (Fla. 4th DCA 2005) (emphasis in original) (quoting *Ray v. State*, 755 So. 2d 604, 609 (Fla. 2000); *see also Ward v. State*, 568 So. 2d 452, 453 (Fla. 3d DCA 1990). "A defendant who does not participate in the independent act of his co-felon is exonerated from any punishment imposed for the independent act." *Id.* (citing *Ray*, 755 So. 2d at 609). There is no indication from Defendant's motion that he ever provided his counsel with the information contained in his proposed testimony. Furthermore, there was ample circumstantial evidence of Defendant's involvement in the conspiracy to commit home invasion robbery and burglary offenses. First, Pate and Carter testified that Defendant was involved in the charged offenses. *See* Trial Transcript at 59-84, 257-305. Second, Defendant's DNA was found on the ski mask which was torn off one of the perpetrators in the victim's home. *Id.* at 245 (lines 5-25) - 247 (lines 1-15), 253 (lines 8-25) - 254 (lines 1-4). No reasonable attorney would have advised Defendant to rely on an "independent act" defense given the evidence supporting his involvement with the charged offenses. For this reason, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

(Ex. I, pp. 263-65).

A criminal defendant has a "fundamental constitutional right to testify in his or her own behalf at trial," and that "right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *United States v. Teague*, 953 F.2d 1525, 1532 (11th Cir. 1992) (en banc). A petitioner may establish deficient performance under *Strickland* "where counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone." *Gallego v. United States*, 174 F.3d 1196, 1197 (11th Cir. 1999).

Ortiz's colloquy with the trial court demonstrates that he was aware of his right to testify; that he and counsel discussed whether he should testify; that he willingly and independently made the decision not to testify; and that he was not forced into that decision. (Ex. C, pp. 308-09 (colloquy)). The record also establishes that Ortiz's decision was not based on "fallacious" advice by counsel concerning the State's evidence.

The State presented its case <u>before</u> Ortiz decided not to testify. Ortiz was fully aware of the DNA evidence. (Ex. C, pp. 237-41, 245-47 (Dr. Pollock's testimony discussing results of DNA testing on the ski mask)). Ortiz had heard counsel's extensive cross-examination of Carter and Pate. (Ex. C, pp. 76-83 (cross-

examination of Carter)), pp. 296-304 (cross-examination of Pate)).[10] Ortiz knew weapons and clothing were admitted into evidence. Ortiz decided not to testify knowing all the evidence against him. (Ex. C, pp. 308-09 (colloquy concerning Ortiz's decision not to testify)). The state court reasonably determined that Ortiz failed to establish his decision not to testify was the product of deficient advice by counsel.

Fairminded jurists can also concur in the State court's conclusion that Ortiz failed to show a reasonable probability that the jury would have believed his story. Christopher Pate's testimony that two of his co-defendants entered Robinson's home was corroborated by the victim's testimony. Kameo Carter testified that all four co-defendants got out of the car, left together, and returned together. Given this testimony and the totality of the State's evidence, Ortiz has not shown—and certainly has not established beyond "reasonable argument"—that there is a

---

[10] Counsel cross-examined Carter about her denial of having purchased drugs from Robinson (which was contrary to Robinson's testimony) and her recollection of the night in question. (Ex. C, pp. 76-83 (cross-examination of Carter). Counsel cross-examined Pate about his prior felony convictions, his status as a Prison Releasee Reoffender, his cooperation deal with the State, his prior inconsistent statements in a pre-trial deposition, his prior inconsistent statements to law enforcement, and inconsistencies between his testimony and Carter's and Robinson's testimony. (Ex. C, pp. 296-304 (cross-examination of Pate)).

reasonable probability his trial outcome would have been different had he testified. *See, e.g., Jones*, 487 F. App'x at 566-68 (holding that petitioner failed to establish trial counsel was ineffective in advising him not to testify to impeach the victims' identification of him as the robber; petitioner failed to show "no competent counsel" would have advised him not to take the stand, and further failed to show a reasonable probability of a different result had he testified because trial counsel extensively cross-examined the victims about their identification of petitioner, counsel challenged the accuracy of the witnesses' identifications during closing argument, and there was other evidence corroborating the victims' identification testimony).

Ortiz's remaining assertion concerning counsel's failure to advise him of an "independent act" defense is likewise unavailing. Ortiz failed to show attorney error or prejudice, given his failure to make any showing that he informed counsel of the facts that he now asserts in support of an "independent act" defense, and given the evidence of his involvement in the crimes. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or action. Counsel's actions are usually based . . . on information supplied by the defendant."); *Chandler v. United States*, 218 F.3d 1305, 1324 (11th Cir. 2000) ("The reasonableness of a trial counsel's acts, including lack of investigation . . ., depends critically upon what information the client

communicated to counsel.") (internal quotation marks omitted); *see also Van Poyck v. Fla. Dep't of Corr.,* 290 F.3d 1318, 1325 (11th Cir. 2002) ("Information supplied by a petitioner is extremely important in determining whether a lawyer's performance is constitutionally adequate.").

The state court's rejection of Ortiz's claim was consistent with clearly established federal law and was based on a reasonable determination of the facts. Ortiz is not entitled to federal habeas relief on Ground Six.

### **Ground Seven**      **"I.A.C. For Failing To Object To DNA Evidence Discovery Violation"**

Ortiz's seventh claim assumes that the State failed to disclose Dr. Pollock's report finding him a possible contributor to DNA on the ski mask. Ortiz claims that counsel should have objected, requested a *Richardson* hearing to determine whether there was a discovery violation,[11] and moved for a mistrial. (Doc. 5, pp. 11, 24).

The parties agree that Ortiz presented this claim to the state courts as Ground Seven of his Rule 3.850 motion, the state circuit court denied relief on the merits in a reasoned order, and the First DCA summarily affirmed without explanation. (Doc.

_____

[11] *See Richardson v. State*, 246 So. 2d 771 (Fla. 1971) (holding that a violation of the rules of criminal procedure by the State requires reversal of a conviction unless the trial court conducts an inquiry into all the circumstances surrounding the breach, with the State having the burden of showing that the defendant was not prejudiced).

Page 52 of 65

5, p. 12 Doc. 29, pp. 8, 73). The State asserts that Ortiz is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 74-75).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. This court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's written order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

> As to Ground Seven, Defendant alleges that trial counsel was ineffective for failing to object to the State's introduction of DNA results that, according to counsel, were not provided prior to trial. Had counsel objected and moved for a mistrial due to their not having the expert's report, the objection would have been overruled and the mistrial denied because there was evidence in the record that the report was provided, or at least disclosed, to the defense prior to trial. *See* Trial Transcript 241 (lines 12-25) - 244 (lines 1-10). No *Richardson* hearing would have been conducted for the same reasons; there was no discovery violation. *Id*. For this reason, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

(Ex. I, pp. 265-66).

The state court reasonably determined that Ortiz's underlying allegation of a discovery violation was refuted by the record. The trial transcript, the documents in the state court record, and defense counsel's postconviction testimony all confirm that the State disclosed Dr. Pollock's report well in advance of trial. (Ex. C, pp. 241-44 (trial transcript confirming State's disclosure); Ex, I, pp. 210-14 (record of State's production of report during discovery); (Ex. K, pp. 56-59, 60-61 (defense counsel's postconviction hearing testimony)). Counsel cannot be ineffective for failing to perform a futile act. *Meders*, 911 F.3d at 1354; *see also Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief."). Ortiz is not entitled to habeas relief on Ground Seven.

### Ground Eight       "I.A.C. For Failing To: Object To Improper Remarks By The Prosecutor"

Ortiz complains that in closing argument, the prosecutor used a large screen projector to spell out the word "Guilty." Ortiz also alleges that the prosecutor stated: "And you should find the defendants guilty because that's exactly what they are." Ortiz claims that his counsel was ineffective for failing to object to these comments and move for a mistrial, because the statements expressed a personal belief, as a government agent, that Ortiz was guilty. (Doc. 5, pp. 12, 24-25).

The parties agree that Ortiz presented this claim to the state courts as Ground Eight of his Rule 3.850 motion, the state circuit court denied relief on the merits in a reasoned order, and the First DCA summarily affirmed without explanation. (Doc. 5, p. 13; Doc. 29, pp. 8, 77). The State asserts that Ortiz is not entitled to habeas relief because he fails to meet § 2254(d)'s demanding standard. (Doc. 29, pp. 77-81).

The First DCA's summary affirmance is an "adjudication on the merits" entitled to deference under 28 U.S.C. § 2254(d). *See Richter*, 562 U.S. at 99, 100. This court "look[s] through" the First DCA's unexplained decision to the circuit court's final order denying postconviction relief, and presumes that the First DCA adopted the same reasoning. *Wilson*, 138 S. Ct. at 1192.

The state circuit court's written order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

> As to Ground Eight, Defendant alleges that trial counsel was ineffective for failing to object to the State's use of a projector to spell out the word "guilty" and telling the jury that Defendant is guilty during closing argument. "Wide latitude is permitted in arguing to a jury." *Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982). Here, as to the portion of the argument referenced, "the prosecutor [was] merely submitting to the jury a conclusion that he or she [was] arguing [could] be drawn from the evidence." *Davis v. State*, 698 So. 2d 1182, 1190 (Fla. 1997). The State is "allowed to argue reasonable inferences from the evidence and

> to argue credibility of witnesses or any other relevant issue so long as the argument is based on the evidence." *Miller v. State*, 926 So. 2d 1243, 1254-55 (Fla. 2006). Here, the evidence presented at trial supported the State's argument and was not improper. *See* Trial Transcript at 378 (lines 14-25) - 379 (lines 1-10). "[T]here is no reasonable probability that [the State's] comments affected the verdict." *Hitchcock v. State*, 755 So. 2d 638, 643 (Fla. 2000). Furthermore, "[I]t is not presumed . . . that jurors are led astray to wrongful verdicts by impassioned eloquence." *Johnson v. State*, 348 So. 2d 646, 647 (Fla. 3d DCA 1977). Had counsel objected to [the] State's arguments, the objection would have been overruled. For these reasons, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

(Ex. I, p. 266).

Florida's state-law standard for reviewing prosecutorial comments is the following:

> Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done." Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

*Breedlove*, 413 So. 2d at 8 (quoting *Darden v. State*, 329 So.2d 287, 289 (Fla. 1976)) (other citations omitted). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. A prosecutor may argue both facts in evidence and reasonable inferences from those

facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted); *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984) (holding that the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence). When the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is permissible. *United States v. Granville*, 716 F.2d 819, 822 (11th Cir. 1983).

This court has reviewed the evidence presented at trial, the entirety of the parties' opening and closing arguments, and the trial court's instructions to the jury. The state court reasonably determined that the prosecutor's arguments were not improper and, accordingly, that defense counsel's failure to object was not ineffective. *See Chandler v. Moore*, 240 F.3d 907, 914 (11th Cir. 2001) (concluding that the prosecutor was properly commenting on the evidence, none of the prosecutor's contested statements were improper, and defense counsel could not be deemed ineffective for failing to object); *see also Bolender v. Singletary*, 16 F.3d 1547, 1473 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance."). Ortiz is not entitled to relief on Ground Eight.

**Ground Nine**      **"I.A.C. For Failing To File A Motion For New Trial"**

Ortiz's final claim faults trial counsel for failing to move for a new trial under Florida Rules of Criminal Procedure 3.590 and 3.600. Ortiz asserts that the motion "could have" been based on the substantive issues underlying his ineffective assistance claims in Grounds One through Eight above (the alleged non-disclosure of Dr. Pollock's report, the alleged improper admission of physical evidence, the failure to sever trials, etc.). Ortiz asserts that counsel also could have argued these issues: (1) the trial court lacked jurisdiction because he was arraigned before the formal information was filed, and (2) the prosecutor knowingly presented the false and perjured testimony of Christopher Pate. (Doc. 5, pp. 13-14, 25-26).

The parties agree that Ortiz presented this claim to the state courts as Ground Nine of his Rule 3.850 motion. (Doc. 5, p. 14; Doc. 29, pp. 8, 82). The state circuit court's written order correctly identified *Strickland* as the controlling legal standard (Ex. I, pp. 224-25, 258, 259-60), and denied relief for these reasons:

> As to Ground Nine, Defendant alleges that trial counsel was ineffective for failing to file a motion for new trial. Defendant essentially reargues other grounds raised in his motion, as well as challenging the sufficiency of the evidence used to convict him. A defendant cannot challenge the sufficiency of the evidence underlying his convictions through a rule 3.850 motion, especially where there has been a direct appeal. *Betts*, 792 So. 2d at 590. Motions filed under rule 3.850 "cannot be utilized for a second appeal." *Jones*, 446 So. 2d at 1061-62. In addition, "[i]ssues which either were or could have been

> litigated at trial and upon direct appeal are not cognizable through collateral attack." *Johnson*, 593 So. 2d at 208. For these reasons, Defendant fails to show either error by counsel or prejudice. Accordingly, the claim raised is without merit.

(Ex. I, pp. 266-67).

Ortiz's postconviction appeal argued that the circuit court's rejection of his claim was clearly erroneous because his claim was an ineffective assistance of counsel claim cognizable under Rule 3.850, and not a substantive challenge to the sufficiency of the evidence. (Ex. L, p. 39). The State responded that the denial of postconviction relief should be affirmed because Ortiz's claim merely rehashed the first eight grounds of his postconviction motion. (Ex. M, p. 50). The First DCA summarily affirmed without explanation. (Ex. N).

The State now asserts that Ortiz is not entitled to federal habeas relief because (1) the state court reasonably determined that counsel was not ineffective with regard to the first eight issues comprising this claim; (2) the state court's imposition of a procedural bar concerning Ortiz's challenge to the trial court's jurisdiction is consistent with Florida's clearly established procedural rule that issues which should have been raised pretrial or on direct appeal are not cognizable in a Rule 3.850 motion; and (3) even if the state court erred in misconstruing Ortiz's final point as a

challenge to the sufficiency of the evidence, his ineffective assistance claim fails on the merits on de novo review. (Doc. 29, pp. 82-86).

The State is correct that to the extent Ortiz claims that his counsel was ineffective for failing to move for a new trial based on the issues underlying Grounds One through Eight above, his claim fails for the reasons outlined in Grounds One through Eight. *See* Discussion of Grounds One - Eight, *supra*. As to Ortiz's remaining two arguments concerning counsel's failure to move for a new trial based on lack of jurisdiction and false testimony, the court need not consider the state court's decision, because Ortiz's claim fails on the merits even on de novo review.

Ortiz has not shown that his January 20, 2012, waiver of arraignment and plea of not guilty (Ex. A, p. 20), was defective in any way, or provided a colorable basis to move for a new trial under Florida Rule of Criminal Procedure 3.590 and 3.600. *See* Fla. R. Crim. P. 3.600 (listing cognizable grounds for a motion for new trial); *see also* Fla. R. Crim. P. 3.160 (arraignment procedure); Fla. R. Crim. P. 3.170 (plea procedure).

Additionally, Ortiz has not shown that counsel was ineffective for failing to challenge the weight of the evidence in a motion for new trial. Under Florida Rule of Criminal Procedure 3.600(a)(2), a court shall grant a new trial if the "verdict is contrary to law or the weight of the evidence." Fla. R. Crim. P. 3.600(a)(2). "When

considering a motion for new trial under rule 3.600(a)(2) based on a claim that the verdict is against the weight of the evidence, the trial court must exercise its discretion to determine 'whether a greater amount of credible evidence supports' an acquittal." *Ferebee v. State*, 967 So. 2d 1071, 1073 (Fla. 2d DCA 2007) (citing *Geibel v. State*, 817 So. 2d 1042, 1044 (Fla. 2d DCA 2002)). "Rule 3.600(a)(2) thus enables the trial judge to weigh the evidence and determine the credibility of witnesses so as to act, in effect, as an additional juror." *Tibbs v. State*, 397 So. 2d 1120, 1123 n.9 (Fla. 1981).

Ortiz argues that Christopher Pate's testimony was false and therefore could not support his convictions. At trial, the prosecutor acknowledged that Pate's deposition and trial testimony differed as to some details, but argued that the testimony remained consistent concerning Ortiz's roles in the burglary, conspiracy, and battery. Defense counsel fully cross-examined Pate on the inconsistencies and argued in closing that Pate's version of events should not be believed. It was within the province of the jury to determine whether Pate was credible. By finding Ortiz guilty as charged, the jury determined that Pate's testimony and the remaining evidence produced at trial was sufficient to find that Ortiz committed the charged crimes. The jury was not required to accept Pate's, or any other witness's testimony as a package, but could determine which portions of the testimony were most

credible. *Wynne v. Adside*, 163 So. 2d 760, 763 (Fla. 1st DCA 1964) ("[A] jury is not required to accept a witness' testimony in its entirety or wholly reject it, for the jury may accept such protions [sic] of a witness' testimony as they may deem credible and consistent with the proven circumstances and probabilities and at the same time reject other portions which they deem incredible or inconsistent with the proven circumstances and probabilities."); *see Moore v. Chesapeake & O. Ry. Co.*, 340 U.S. 573, 576 (1951) ("[I]t is the jury's function to credit or discredit all or part of the testimony."); *see also United States v. Sharif*, 893 F.2d 1212, 1214 (11th Cir. 1990) (stating that a jury is free to believe or disbelieve all or part of a witness's testimony). Notably, the trial judge stated at sentencing that he believed co-defendant Pate's testimony, and described it as "damning evidence". (Ex. C, p. 433).[12]

Given this record, Ortiz fails to show a reasonable probability that, but for counsel's failure to move for a new trial, the result of his criminal proceeding would have been different. *Richter*, 562 U.S. at 112 ("The likelihood of a different result

---

[12] With regard to co-defendant Janiel Perez, the judge also mentioned the convenience store video showing him wearing shoes that were later recovered from Perez's and Ortiz's residence.

must be substantial, not just conceivable."). Ortiz is not entitled to habeas relief on Ground Nine.

## IV.    Certificate of Appealability is Not Warranted

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides: "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued, "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. *See* 28 U.S.C. § 2254 Rule 11(b).

"[Section] 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. at 336 (quoting 28 U.S.C. § 2253(c)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. —, 137 S. Ct. 759, 774 (2017) (quoting *Miller-El*, 537 U.S. at 327). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim,

a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added). Here, Petitioner has not made the requisite demonstration. Accordingly, the court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." 28 U.S.C. § 2254 Rule 11(a). If there is an objection to this recommendation by either party, that party may bring such argument to the attention of the district judge in the objections permitted to this report and recommendation.

## V.    Conclusion

For the reasons set forth above, it is **ORDERED**:

The clerk shall change the docket to reflect that Mark S. Inch has been substituted as the respondent in this cause.

In addition, the undersigned respectfully **RECOMMENDS** that:

1.  The amended petition for writ of habeas corpus (Doc. 5), challenging the judgment of conviction and sentence in *State of Florida v. Jeovany Texidor Ortiz*, Levy County Circuit Court Case No. 2012-CF-18, be **DENIED**.

2.  The District Court **DENY** a certificate of appealability.

3.  The clerk of court close this case.

At Panama City, Florida, this <u>17th</u> day of June, 2019.

<u>/s/ *Michael J. Frank*</u>
**Michael J. Frank**
**United States Magistrate Judge**


## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**